James v. Richman It's a big day for the Commonwealth of Pennsylvania. May it please the Court, my name is Calvin Coons from the Office of Attorney General and I represent the Department of Public Welfare and the Secretary of the Department of Public Welfare in this matter. With the Court's permission, I'd like to reserve two minutes for rebuttal. Your Honors, Medicaid is designed to be the payer of last resort for medical expenses, including long-term care for needy persons, that is, persons who meet certain income and resource limitation levels. Although the amendments in 1998, which are called the Spousal Anti-Impoverishment Act, were designed to protect a community spouse from impoverishing herself or himself, to provide support for an institutionalized spouse, they did not change that purpose. Now, the case that we've cited that generally discusses this is the Bloomer case, and the Bloomer case discusses the twin purposes of the Anti-Impoverishment Act as doing that and also preventing couples who have ample resources from qualifying for Medicaid, which as I said before, is to be a payer of last resort for needy people. Is Act 42 implicated in this case? I'm sorry, Your Honor. Is Act 42, which placed additional restrictions on annuities, is that implicated? No, I think it is not, Your Honor. I think this is... And it was not relied on, right? You didn't rely on that? We did not. And this is a case of a commercial annuity, and our point, Your Honor, is simply that the accommodation that the court struck in the Anti-Impoverishment Act was to say that a community spouse would be able to keep her income, or his income, and would be able to keep one half of the assets, there would be some assets that would be exempt, and others up to a ceiling, which now is around $104,000. Now, Mrs. James, in this case, seeks to effectively increase the ceiling by taking $250,000 in cash and buying an annuity, which she now claims is income. Now, our argument is that this is not income, because the annuity has a cash value. There is a market for it, as we've introduced evidence, and there's a specific buyer, not only is there a market for annuities of this type, but there's a specific buyer. We introduced evidence from Mr. Goodman of J.G. Wentworth, who said that he would buy this particular annuity and gave a specific sum that his company would pay for it. Now, under the code of federal regulations, this is all that is required. If property can be converted or liquidated, converted into cash, then it is a resource. And we think that that is exactly what has happened here, that the annuity still has a cash value and it's still a resource. Now, that means finding that the anti-assignment provisions are invalid. Well, Your Honor, I don't think it ... Let me say this about that. First of all, Mr. Goodman testified that the anti-assignment provisions are not an impediment to his firm's purchasing it, and we think that is the most important consideration. Secondly ... Well, he ... Of course, that's his business. Right. And he's a factor of sorts. Yes, Your Honor, he's a factor. And we've got amicus briefs saying that even if you say that even though there is an impediment to the right and there will be litigation over whether there's an impediment to the power to make the assignment, that in effect, these companies are simply buying a lot of litigation if they permit these assignments to go through. So they are ... In effect, they're saying they're not freely assignable because they're going to be subject to a lot of litigation. Well, Your Honor, the ... That may or may not be legally significant, but I gather that's their argument. Well, yeah. Our argument is that the most important thing is that there is a buyer and that the code of federal regulation says that you have the power, the right, or the right to liquidate. But let me also say that our view is ... And there's a case that I found more recently, I think the most recent Pennsylvania case on assignment clauses like this, which I found when I was preparing for the argument, which is the case of Edgar v. Golf Insurance Company, 903 Atlantic 2nd of 1219, which is a Pennsylvania Supreme Court case in 2006, which I think essentially says, in the context of insurance contracts, that once liability is fixed, that these types of anti-assignment clauses aren't often given effect, aren't usually given effect, because they're not meaningful. I mean, you're not changing the risk, you're not changing the obligation of the person, of the obligor, and we think that's true here. Was that a death benefit case? Pardon? Was that a death benefit case? I'm not ... I think Edgar was a death benefit case. It was insurance. I think it was an umbrella insurance policy, Your Honor. And I think what they said was after liability was fixed, then there wasn't any change in the risk. And I think it's similar here, because here the obligation ... The advocates say that's not true, because there's going to be ... A lot of times people then try to revoke the assignments, and there's a lot of litigation. Well, they do say that, Your Honor. That's not in the record, certainly. And what I would say, I suppose, is that there are also means, if you look at the Platson case, which we've cited in our brief, it's a state court case, it talks about other ways that these types of sales can be engineered from the perspective of the buyer, which wouldn't even involve assignment. In other words, you could specify that the monies be paid into a post office box, and then somebody could be given power of attorney to withdraw them and cash a check. So it might not even involve an assignment at all. But what I would finally say is that if Your Honor has a question about that, this case was decided certainly on cross motions for summary judgment, and if you otherwise agree with us and think that there are facts in dispute with respect to whether or not the purchase could take place, then I suppose the right thing to do would be to remand for development of the record on that point. Our point is that we think that this construction of the statute, which says that an annuity which can be sold is still a resource, is consistent with the purpose of the Medicaid Act, in that it provides these resources for people who are, in fact, needy. Under the theory that you could buy a commercial annuity, in this case for $250,000, it could be for $300,000 or $500,000, essentially what you would be saying would be that virtually anybody could qualify for Medicaid by the simple expedient of buying an annuity, even though that annuity had substantial cash value. Mr. Coons, why isn't this case different than some others, and different than what I think Transmittal 64 was directed to, in that the resource assessment was made, as I understand they are made, as of the date of institutionalization, and that was, I believe, August 10th. And on August 15th, which was five days before the actual form was completed, on August 15th, Mrs. James went out and bought the annuity for $250,000 plus the car. Why isn't the key date here the date of institutionalization? Because it seems to me that what has happened here and what makes this different than what I think Transmittal 64 was looking at, this is not an annuity that was part of the joint estate when Mr. James went in. This was a way they chose to use the money after he was seeking medical assistance. Well, I'm not sure I quite understand your question, Your Honor, but it seemed as if the timing was such that the annuity was purchased in order to qualify for Medicaid. Is that what you're asking? Yeah, exactly. This annuity was clearly purchased after he went into the nursing home. And the form that was filled out as of September 20th was asked to list the assets at the time he went into the nursing home. And that's what the Department of Public Welfare found, and they found that they had $278,000 of excess resources that had to be spent. And then Mrs. James came back and said, well, wait a minute, but I bought an annuity, and I bought a car, and therefore I shouldn't have to spend anything. Why isn't that different than buying an annuity that was part of the estate prior to entering the nursing home? Well, I think it's – I think when we talk about Transmittal 64, Transmittal 64 has to do with annuities which are purchased for less than fair market value within a certain look-back period. In other words, it has to do with improper transfer of assets. And that could happen in all kinds of ways. You could give property to your son. You could do all kinds of things. And annuities is just one way – it's just one way you can do that. It looks from the timing like – Don't you argue here, and I think the way you argue that this is just flat-out a resource. Right. The look-back period doesn't apply to this case. It doesn't, Your Honor. That's exactly right. And what I'm saying is that since the purchase was post-institutionalization, we're not dealing with a look-back, but we're really dealing with an appraisal of what that annuity is worth. Well, I think you're right, and we're not dealing with look-back. We're not saying that this was an improper transfer for less than fair market value. We're simply saying that this is a resource, that this is something that has value, that Transmittal 64 at the same time provides that the term trust includes an annuity to the extent and such manner as the Secretary specifies. Well, yes, Your Honor, but the Secretary hasn't really specified any further manner in which an annuity is like a trust. But an irrevocable trust is exempt. And if an annuity can qualify as irrevocable by its language, then is it not considered a trust? Well, Your Honor, let me say this. First of all, again, Transmittal 64 doesn't have to do with the situation that we're talking about, which is whether it's a resource. It has to do with whether it's an improper transfer of property within the look-back period. Well, it's got that title, but it's got language that can be interpreted as wrong. But I think, with respect, I think our suggestion is you have to look at what it's designed to do. But let me also say this. We don't think that an annuity or the Secretary has said an annuity is a trust. But if you look at a section that talks about trusts, which it would be 1382B, it does talk about situations in which trusts, to the extent a corpus is available to be used, it is a resource. So we don't think it's like a trust. But if you look at a trust and you say, to the extent a corpus is available, that's a resource. Well, that's sort of the situation here, because what we're saying is that the annuity can be sold, it has a value, and that that's a resource. Is there enough on the record before the District Court as to the annuity's liquidity? We think there is, Your Honor. In talking to Chief Judge Sirica earlier, I said, if you have some doubts about that, the thing to do would be to remand it. But we think there is, because there's evidence that there's a buyer for a specific price, that there's a market for it. And we've talked about the anti-assignment clause, which we don't think is an impediment, and neither does Mr. Goodman from J.G. Wentworth. I'd like to just direct the Court's attention to some cases that we cited, I think at pages 20 to 22 of our briefs, which are cases which we think got it right. They're state court cases that analyzed the issue, talked about Transmittal 64, and said that really that was beside the point, that you had to look to see whether it was a resource. Now, the Department didn't win in all those cases. In fact, in most of those cases, it lost, because there wasn't evidence on the record, like there is here, that the annuity can be purchased, that it has, there's actually a purchaser for it, and there's a market for it. Your Honor, I see that my time... No, we'll give you five more minutes. Oh, okay, thank you, Your Honor. Anyway, what I was saying was that those cases are cases where the courts have looked at them, and they've gone through the state court system, and have found that in some cases that the burden wasn't met, because there wasn't evidence that they could be sold, but we have evidence of that here. In a case where there was evidence that the annuity could be sold as a state of gross, a North Dakota case, and that, I think, is another good case to look at. Our point, again, Your Honor, is simply that if annuities can be purchased in this way, and unlimited amounts of resources can be converted like this into income, even though the annuity has value, then essentially, at some point, the bank will be broken, and you will have people who will be wealthy people, who will be qualifying for these medical benefits, which were medical assistance benefits, which were never intended for them, and that the or increase in taxes. But what would be your argument? Let's assume it were not assignable, if it were absolutely clear. If it could be sold, Your Honor, then I think that it would not be a resource. Our argument is that since it can be sold, it is a resource. No, I understand that, but if assuming it could not be sold or assignable, then the very good argument that you just made now would be beside the point, would it not be? Well, I think our argument is twofold, Your Honor. I think my point in making that argument was simply that I think the statute ought to be construed in a way that promotes its purpose rather than defeats it. But you're right. You're right. There has to be a statutory basis for the argument as well. Obviously, there's tension here between trying to prevent the pauperization of the uninstitutionalized spouse and, on the one hand, and for lack of a better word, gaming the Medicaid system. I do understand that, Your Honor. Let me ask you a question about irrevocable trusts, which you acknowledge are exempt. Is there any time limit on when the trust can be established or should have been established? Does it have to be, as Judge Fischer was asking, before the claimant goes into the nursing home? Is the date not mentioned or irrelevant? Well, Your Honor, to be honest, I'm not positive. I think, and again, I'm thinking that for purposes of Transmittal 64, I think that you're dealing with a look-back period of three years, and now I think under the Deficit Reduction Act, five years, in terms of asset transfers. But I think that's the case. I have to confess I'm not positive. Talk about the issue here that there was an appeal filed by the Jameses from the determination of the Department of Public Welfare of ineligibility. That appeal was pending, and they went into federal court with this 1983 action and sought the injunction. The relief they sought and actually the relief they obtained from Judge Caputo was the injunction. Why wasn't there an adequate remedy at law? Well, we think there was, Your Honor, and we're saying that we think there was an adequate remedy at law because had those administrative proceedings gone through to conclusion, had we been wrong, they would have been able to recover the amounts of money that they paid up until the time of admission, I believe. So they really would not have lost anything. And, in fact, the fact that these systems do work, again, I will cite to you the state court cases that we've cited in our brief. These are all cases that went through the state administrative system and came up and made most of the same arguments that are being made here. So we think that there was an adequate remedy at law, Your Honor. So the ultimate determination through the state appeal process, the state could not turn around at the end and say, all right, if they lost. We lost, we owe you X, but by the 11th Amendment immunity, we aren't going to pay it. Oh, in the state? No, absolutely not. In the state appeal process, no. No, there's a provision for the payment of the money. That's correct, Your Honor. Thank you. Ms. Coons, thank you very much. Mr. Parker. Good morning. Good morning. My name is Matthew Parker. I represent the late Mr. Robert James in this case. I've been asked to inform you that there are two amicus parties in this case, and then if you wish to hear from them, I was to grant some of my time to allow them to speak. And certainly if you have any questions of them, I'm willing to do so. Good. Well, I think the briefs were pretty clear as to what their positions were. Very good. You may go ahead. As you've determined, this is a case about the purchase of a Medicaid annuity by the late Mr. James prior to his qualification for medical assistance. Essentially, a Medicaid annuity is a vehicle by which a community spouse typically takes otherwise available assets and converts them into an unavailable income stream. The State obviously has made the argument that this annuity or the payments from the annuity remain a resource to Mr. James and the denied eligibility. I should point out, Mr. Parker, how about maybe in reverse order, talking about the question that was last asked to Mr. Coons. Why was there not an adequate remedy at law here that should have precluded you from getting an equitable relief? Well, I think first of all, since this is a 1983 action, we weren't required to exhaust the administrative remedies in this case. Isn't there a difference, though, between an adequate remedy at law and exhaustion? Yes. The exhaustion of remedies theory obviously was addressed by this Court in Savory v. Richardson, and the question of whether or not we had to proceed with an administrative hearing before proceeding with a 1983 action was brought up in that matter, and you concluded that we did not have to do so. There was nothing in Title XIX requiring us to proceed through the administrative appeals process before seeking redress under 1983. And I would also point out that ALJ proceedings are intended to address State law issues. I mean, if you're asking for a State… Right, no, no, but Judge Fischer wants… I think they're different matters here. If you're not entitled to injunctive relief, if there is an adequate remedy at law, why couldn't you be compensated by money damages here? Well, there were a variety of reasons why we wanted to proceed under the 1983 actions. One of them is that the ALJ proceeding would not allow us to hear the question of whether the State law was violative of Federal relief. And so we were not going to get adequate relief through that proceeding. But that ended up not even being an issue. That's right. The Judge decided that because the State had not cited the statutes that we questioned at issue, despite the fact that substantively they appear to be the very issues in this case, they hadn't cited them for the purposes of denying them. But the issue is not… it's not a question of what issues you can raise and whether you want to get a law set aside. It's a question of relief for your client. Can your client get adequate relief under legal remedies as opposed to equitable remedies? And why could your client not get adequate relief here? Through the ALJ proceeding? Well, the ALJ proceeding can then be appealed to State court, can it not? And in the State court, the constitutional issue or the preemption issue can be brought up, can it not? Certainly. I guess it's a question I'm not quite understanding because it seems clear that with a 1983 action, we are not required to exhaust the ALJ proceeding. And if you have this criteria that says an adequate remedy of law is the administrative hearings process, isn't that an exhaustion of remedies provision that says one must proceed through the ALJ proceeding before you ever proceed into Federal court? Well, but it's not an exhaustion requirement. It's a requirement that you proceed, pursue the legal remedy as opposed to the equitable remedy if the legal remedy will provide you with the remedy that you seek. Again, it's a sort of a circular reasoning. We realize that we could not get the relief that we were seeking. Why not? Because the ALJ could not consider… But the State court could. In an appeal from the ALJ, the State court could consider constitutional issues and preemption issues. State courts do it all the time. Sure. We perceived at the time that there wasn't the adequate remedy, obviously. In the equitable proceeding, we were facing, obviously, several thousand dollars a month in damages, and we didn't have the right to proceed under the 11th Amendment against the State for those damages, so we perceived there to be less than an adequate remedy at law in that proceeding, and we did not sense at any time that we had to exhaust our remedies in the ALJ proceeding. So I guess I'm unfortunately not understanding your questioning with regards to our requirement to proceed under the ALJ before we ask for redress in this court. Could you have sought a declaratory judgment saying that you were improperly being denied benefits? Not in the ALJ proceeding. The ALJ simply rules on whether or not the Secretary has acted in accordance with then existing State law, and it would have ruled ultimately in favor of the Secretary because they had the statute in place which set forth a presumption that the annuity was an available resource, and that was the very statute we felt was violative of Federal law. The case at issue here ultimately has been modified somewhat by the changes in the law since it arose. In 2005, what has happened is that the Federal government revised this area of the law in the Deficit Reduction Act. It set forth basically the very principles that we've discussed in our brief, the idea that one can transfer the assets to the spouse for the spouse's sole benefit, create an irrevocable arrangement by purchasing one of these annuities, and then ultimately, if it's actuarially sound, not create a transfer. Those three principles are found in the new statute under the Deficit Reduction Act with the provision that Mrs. James today would have to name the State as primary beneficiary for all benefits paid out from that annuity. Therefore, there's been some reconfiguration, if you will, of the very principles here, and Congress seems to have, again, sanctioned the use of these annuities in an application process. The State court has also opined on this matter. As you mentioned, these cases do make their way through the State system, and eventually in the Ross v. Department of Public Welfare case, the Commonwealth court did rule consistently with the lower court in this matter. Therefore, the opinion was presented to you. I do understand the State had asked the Pennsylvania Supreme Court for review, but at the very least our State has spoken in this area as well. There are three fundamental reasons why I believe Judge Caputo ruled appropriately. One is that the judge found that there's no requirement, either in the statutes that existed at this time or Transmittal 64, to consider offers from third parties to buy this annuity or the payment stream. In the Medicaid system, Congress defines assets as either exempt or unavailable. The car, for example, has been mentioned. Once the car is purchased, it acquires its exempt status. It is so defined as that. Despite the fact that the State could come along and find a willing buyer for the car, it doesn't change its exempt identification, and that is the same with this income stream. Mr. Parker, under the Medicaid statute, DPW found that there were, I think the number was $278,000 of available assets. Once that determination is made, can the community spouse do whatever the community spouse wants to with that money and basically spend down what's available? What you referenced was a resource assessment. It's a snapshot of all the assets that are held at the point the person is admitted to the nursing home. After that point, you have to spend down or reduce them in some fashion to the required resource allowance before you're eligible for benefits. In this case, Mrs. James went and she purchased an annuity for $250,000. She purchased a car for $28,000. What if she had just gone and put it in a stock fund, and she found out a month later that the stock wasn't worth anything, and so therefore there was nothing left? Is there any difference? In that case, well, obviously you have an investment that plummets in value. But when she got it, she got back shares of stock that had a fair market value of what she paid for them. It is possible that the result would be the same. There's a loss in value, and therefore you can go back in and say, listen, I've lost this money. I guess that's what I'm asking. Are there any rules on what you can do? You cannot give the money away. You can't give it away? You cannot gift it to children. There was a discussion of an irrevocable trust, a pure irrevocable trust. If you had created that, that would be a gift resulting in an ineligibility for these benefits. But you can spend it on anything that you'd like, be it a car, a bigger house, burial accounts. In this case, she spent the money on an annuity that effectively converted the assets into an income stream. It's a strange twist in the rules that allows the income from this annuity or payments from the annuity to be treated as pure income to the recipient. So Mrs. James has pure income every month. And the corresponding rule says that none of the income available to the community spouse can be paid to the institutionalized spouse. So by purchasing one of these annuities, you actually convert the available resources into an unavailable stream of payments. It's a strange twist in the rules that, as judges have pointed out, perhaps was a loophole at one point, but Congress has revisited the issue more than once and has decided it still remains appropriate planning. Apparently it hasn't become abusive enough. They've also put controls over it, as I mentioned, by naming the state as the primary beneficiary. The state does have an interest in these products today. They did not at the time that this new annuity was created. Did a look-back provisions apply in this case? No. They do not? No. So you agree with Mr. Coons on that? That's right. They're on the look-back because it's a purchase for value. It would be a transfer if you didn't follow Transmittal 64. Transmittal 64 requires the annuity terms to be within the timeframe of the annuitant's life expectancy. That was the only criteria the Secretary ever set forth in an effort to control these annuities. Does it make a difference if the purchase of the annuity occurred before the institutionalization rather than after the institutionalization? No. I mean, in effect, you would have this annuity available at the resource assessment, but it would not be counted as a resource because it's a pure income stream to the community spouse. No. I'm sorry. The state says that it is assignable. That's right. There's a market for it. Why are they incorrect? Well, first of all, you have to analyze what is this they're asking to sell or transfer. In accordance with Judge Caputo's reasoning, the income is not available to the institutionalized person, and they seem to be confusing resource rules and income rules. The income is unavailable to pay for the institutionalized person's care, and Congress has so defined it as that, therefore the state cannot impose what is in essence a resource rule to try and convert this income stream to an available asset. So it doesn't make any difference whether it's assignable or not? I think there has to be strict terms in the contract making it non-assignable because you need to meet the sole benefit test. These payments must be for the sole benefit of the community spouse and no other person. That's the only way the system works. You can't do this with a child, for example. It must be solely for the benefit of the community spouse. So while there may be some dispute between right and power, at least as to the person who gave the annuity in the beginning, it would be non-assignable because that person has already signed off. That is correct.  And I think if you look at the methodology surrounding the analysis of these contracts when someone is applying for Medicaid, they're supposed to follow the SSI guidelines for determining whether these assets are available or unavailable. What the state is trying to do with their looking at New Jersey contract laws, they're trying to find a contractual analysis outside of the Medicaid system to determine whether this annuity can be assigned to a third party. We're supposed to be focusing on what the Medicaid rules apply. And if we allow the state of Pennsylvania to find a state system to analyze these contracts, then all 50 states can come up with their own analysis as to whether this annuity is or is not available. There's supposed to be a sense of uniformity when analyzing whether contracts for payments or money are available to somebody who wants to qualify for Medicaid. You brought this suit, is it 1983, actually? I did. Claiming a constitutional violation? Yes. And what was that constitutional violation? Well, in each one of the statutes we're setting forth, there is an individual right alleged for the purpose of determining whether or not the individual can, in fact, transfer assets to the community spouse, establish an irrevocable trust, establish it within the confines of Transmittal 64. All of those sections represent the individual rights of this person to transfer or structure their assets for the purpose of qualifying for Medicaid. And as Medicaid is a federal program, we felt that those individual rights met the Blessing and Gonzaga test, and that Mr. James, via his spouse, had a right to proceed under 1983 for deprivation. What's the constitutional violation? The constitutional violation would be deprivation of the rights to Medicaid under Title 19. Is that a constitutional violation? Are you claiming lack of due process? You've got me. I just drew a blank and, unfortunately, I can't respond to your question. Are you saying in any case where there is an issue of preemption of state law by federal law that this is the basis for a 1983 action? No, there has to be some deprivation of federal rights associated with personal property rights. And in this case, Mr. James was denied Medicaid via the Medicaid system, but he had a right to receive through the Medicaid system. I think I've covered all of the issues in the area. Let me see if my colleagues have any other questions. Thank you. Good. I have nothing further. Thank you very much, Mr. Parker. Mr. Coons, any questions for Mr. Coons? Nothing further for me, Your Honor. Good. We thank counsel for a very helpful argument. We will take the matter under advisement.